UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUSTIN CUNNINGHAM,<br><br>    Plaintiff,<br><br>    v.<br><br>DISTRICT OF COLUMBIA<br>SPORTS AND ENTERTAINMENT<br>COMMISSION et al.,<br><br>    Defendants. | Civil Action No.  03-839<br>(RWR/JMF) |

MEMORANDUM OPINION

This case was referred to me for resolution of pending discovery motions and several motions in limine.  Each motion will be considered in turn.

A.    <u>Plaintiff's Motion to Limine to Preclude Defendants From Referring To, Mentioning, or Admitting Any Evidence that Alleges that Plaintiff has Ever Received a Citation for Underage Possession of Alcohol</u> ("Plains. Mot. re. Citation")

There may be testimony 1) from two toxicologists that plaintiff consumed substantial quantities of beer on the day he was injured, 2) from several of plaintiff's friends as to his drinking at parties and 3) from one of his friends that he had a phony identification so that he could buy alcohol despite being under age.  On the day he was injured, Cunningham was not yet 21 years old. <u>Second Amended Complaint and Jury Demand</u> ("Second Comp.") ¶ 4.

Three years before he was injured, Cunningham received a citation for underage possession of alcohol. Plains. Mot. re. Citation at 2.  Cunningham's counsel indicates and opposing counsel do not disagree that under Maryland law a violation of the provision pertaining to underage possession is "not a criminal conviction for any purpose." <u>Id.</u> at 3 (quoting Md.

Code. Ann. Crim. Law § 10).[1] Because it was not a conviction, it may not be used to impeach Cunningham if he takes the stand. Fed. R. Evid. 609(a)(1). It is also not admissible to "prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b); Welzel v. Bernstein, No. 03-CV-1887, 2005 WL 1983798, at *2 (D.D.C. Aug. 16, 2005). Obviously, it could not be admitted to prove that because Cunningham had engaged in underage drinking before, it is more likely that he engaged in it on the day of the concert.

Defendant, Contemporary Services Corporation ("CSC"), anticipates that plaintiff may argue that he is entitled to judgment because he was served alcohol at the concert. CSC therefore argues that "if plaintiff had such a convincing fake identification that he had used regularly to get into clubs, such information is certainly germane and relevant to any argument the plaintiff may make to try to pass some of the responsibility for his being drunk onto the defendants." Response and Opposition of Defendant, Contemporary Services Corporation, to Plaintiff's Motion in Limine ("CSC Opp.") at 4. But, I see nothing in the complaint indicating that Cunningham is attempting to premise this defendant's liability on plaintiff's being served alcohol under so called "dram shop" liability; his only claim, sounding in negligence, is predicated on breaches of duty in the management of the concert and none of those breaches involve the serving of alcohol. Second Comp. ¶ 25. It is inconceivable to me that Judge Roberts would permit Cunningham to proceed on a theory of liability that is not even advanced in the complaint. If he does not, then Cunningham's underage possession citation from three years ago has nothing to do with any theory of liability that plaintiff has advanced.

---

[1] All references to statutory material are to the electronic versions that appear in Westlaw and LEXIS.

On the other hand, I appreciate that plaintiff, while not premising liability on his being served alcohol, is arguing that the defendants cannot avail themselves of the assumption of risk defense because "defendants illegally served him [Cunningham] alcohol in the arena." <u>Plaintiff's Motion In Limine to Preclude Evidence of the Language on the Back of the HFStival Ticket</u>, Exhibit 2 at 19. But, the toxicology reports make it impossible for Cunningham to deny that he was drinking and that he was underage at the time is a given. However, the legal question of whether his drinking does or does not bar the assumption of risk defense can be resolved without any need to consider whether Cunningham had drunk alcohol before. Moreover, if Judge Roberts permits the assumption of risk defense to be presented to the jury, it is impossible for their determination of whether Cunningham assumed the risk to turn on whether Cunningham also possessed alcohol three years ago.

CSC also argues that the citation is relevant to the damage calculation in terms of rebutting the testimony of Cunningham's aunt and uncle that they were not aware of his drinking. But, whatever happened at the deposition, no one knows whether they will give similar testimony at trial. They certainly will not be able to testify that, because their nephew did not drink before the day of the concert, he did not drink on that day. Fed. R. Evid. 404(a); <u>Zenian v. District of Columbia</u>, 283 F. Supp. 2d 36, 40 (D.D.C. 2003). Because they cannot, one is hard pressed to see how their impressions of their nephew's behavior when he was not with them would be relevant to any issue. It must be recalled that any opinion they could provide as to his character would have to be limited to his character for truthfulness. Fed. R. Evid. 608(a); <u>United States v. Whitmore</u>, 359 F.3d 609, 616-18 (D.C. Cir. 2004). Testimony by them purporting to express any other character trait their nephew possessed or lacked, offered to prove that his conduct on the

day of the concert was in conformance with it, would be inadmissible.

Cunningham will claim that, but for the injuries he sustained at the concert, he would have received an advanced degree and been employable in a highly competitive occupation. Those suppositions underlie the lost earnings projections of the expert Cunningham will call. See *infra* pp. 15-18. CSC, however, wants to be able to depict Cunningham as a "young man with a rather cavalier attitude about underage drinking and the laws which prohibit it . . . " CSC Opp. at 9. It therefore wants to use the citation to portray Cunningham "warts and all." Id.

But CSC's argument, that it is unlikely that Cunningham would have finished graduate school because he was a disrespectful young man, contemptuous of authority, is nothing more than an attempt to prove that Cunningham would have acted in conformity with certain character traits on a future occasion. That is exactly the kind of blackening of character that Rule 404(a) prohibits. Moreover, there is nothing in human behavior that makes it more likely that, because an underage person possessed alcohol on one occasion, he would be incapable of completing his studies. Unfortunately, as every collegiate administrator would ruefully agree, the converse seems to be true these days.

For their part, Infinity Broadcasting Corp. and SFX Entertainment argue that the citation is relevant to prove Cunningham's knowledge of the risks involved in underage drinking. Defendants', Infinity Broadcasting Corp. and SFX Entertainment, Inc., d/b/a/ Clear Channel Communications, Inc., Opposition to Plaintiff's Motion to Limine to Preclude Defendants From Referring To, Mentioning, or Admitting Any Evidence that Alleges that Plaintiff has Ever Received a Citation for Underage Possession of Alcohol ("Infinity Opp.") at 1-2. But, the only risk that Cunningham ran on the prior occasion was that he would be given a citation if he got

caught. Although he learned that lesson painfully, that risk has nothing whatsoever to do with the risks he may have undertaken in this case by doing whatever it is he is alleged to have done at the concert after having been drinking.

B. <u>Plaintiff's Motion in Limine to Preclude Evidence of the Language on the Back of the HFStival Ticket</u> ("Plains. Mot. re. Ticket")

The back of the HFStival ticket stated: "The holder assumes all risk and danger incidental to the attraction, whether occurring prior to, during, or subsequently to the actual attraction." Plains. Mot. re. Ticket, Exhibit 1 at 4.

The defendants have moved for summary judgment based on this sentence and Judge Roberts has taken the motion under advisement. Obviously, if he grants the motion, the case is over. In the interest of time, however, I will assume that he will deny it and reject Cunningham's claim that the jury should be precluded from seeing the ticket.

Plaintiff worries that the above-referenced sentence will "mislead the jury into thinking that its role would be to apply the language" of the ticket to the case. Plains. Mot. re. Ticket at 3. But, to establish the plaintiff assumed the risks of attending the concert, the defendants would have to establish that the "plaintiff actually knew and understood the full scope and magnitude of the dangers arising from the defendant's conduct." D.C. Civil Jury Instructions § 5.17 (2005). The defendants would also have to at least be allowed to tell the jury about their efforts to warn patrons by putting that language on the back of their tickets. If they are not even permitted to do that, they are being deprived of eliciting the very evidence on which they must rely to present their defense.

C. <u>Plaintiff's Motion In Limine to Preclude Defendants From Referring to, Mentioning, or Admitting Any Evidence of Fake Identification</u> ("Plains. Mot. re. Fake I.D.")

5

Discovery has indicated that on the day Cunningham was injured, he and his friends may have carried fake identifications in order to be served or to buy alcohol although they were underage. Plains. Mot. re. Fake I.D. at 1.  Cunningham's friend, Lee Killen, testified that as he and Cunningham entered the stadium they were asked to produce identification and that Cunningham presented a false identification and was therefore given a wrist band that allowed him to purchase alcohol for himself and Killen. <u>Defendant's Opposition to Plaintiff's Motion to Limine to Preclude Defendants From Referring to, Mentioning, or Admitting any Evidence of Fake Identification</u> at 2.  Plaintiff seeks to preclude the defendants from eliciting any such evidence of Cunningham's use of a fake identification.

In my view, Cunningham's deceiving a merchant to induce him to sell Cunningham alcohol is, under that Rule, probative of truthfulness or untruthfulness.  If Cunningham testifies, he may be cross-examined concerning his possession of the fake identification.  The defendants may not however prove his use of the fake identification by extrinsic evidence. Fed. R. Evid. 608(b).  If I assume that Cunningham will tell the truth when cross-examined, the cat will be out of the bag and there will not be any need to consider whether his possession of the false identification would be independently admissible.  I should note, however, that if Cunningham should, in any way, attempt to rely on the defendants' serving him alcohol to either advance a theory of liability or to defeat a defense, such as assumption of risk, the defendants will unquestionably be able to establish that they were induced to sell him the alcohol because he presented a false identification.

D.   <u>Defendant's Motion for Leave to Redepose Plaintiff</u> ("Defs. Mot. re. Depo.")

Cunningham's deposition was taken on February 10, 2004 and discovery closed on

November 24, 2004.

On November 10, 2005, CSC moved to taken a second deposition of Cunningham "limited solely to his activities and any changes in his physical, emotional or cognitive status since his deposition in February, 2003."[2] Defs. Mot. re. Depo. at 4.  This defendant has also taken a surveillance video of the plaintiff and is willing to surrender it to Cunningham's counsel, but only if they agree to permit Cunningham to be re-deposed.

First, I am not a broker and regrettably I do not work on commission.  I am not about to either broker some deal or bless a deal that one party has proposed.  I am a judge and I must warn CSC that I cannot believe that Judge Roberts will permit it to use the tape at trial if CSC does not make the tape available before trial.  I therefore expect CSC to turn over the tape as soon as it can irrespective of how I rule on its motion to re-depose Cunningham.

Second, CSC justifies its motion by indicating that it only recently learned that Cunningham graduated from the University of Maryland and is employed by the Prince George's County Public Schools and by referencing Cunningham's general obligation to supplement his discovery responses. Defs. Mot. re. Depo. at 2.  But, CSC does not tell me what particular discovery response by Cunningham should have been supplemented by advising CSC of Cunningham's graduation and employment.  Rule 26(e) of the Federal Rules of Civil Procedure speaks of information provided either in the initial disclosures required by Rule 26(a)(1) or a "request for discovery." Fed. R. Civ. P. 26(e).  Unfortunately, CSC does not tell me how the new information rendered either an initial disclosure or a "request for discovery" incomplete.

---

[2] Defendant CSC erroneously states that plaintiff's first deposition took place in 2003, when in fact it occurred in 2004.  See Plains. Mot. re Fake I.D. at Exhibit 3.

Without that information, I cannot ascertain whether Cunningham has violated Fed. R. Civ. P. 26(e) and it would be an abuse of discretion for me to order a second deposition in the middle of trial preparation in the absence of a specific showing that Cunningham failed to supplement an earlier discovery response. See Fed. R. Civ. P. 30(a)(2)(B); Alexander v. Fed. Bureau of Investigation, 186 F.R.D. 128, 133 (D.D.C. 1998).

Defendants also want to depose Cunningham about any discrepancies between his claims of longstanding and severe injuries and that which is revealed by the videotape. But, I have to assume that defendants intend to show the tape at trial, both in their direct case and in cross-examining Cunningham. I assume also that they would like to depose Cunningham to "lock him in" as to the significance of the tape so that their presentation and use of the tape will be without any surprising explanations or rebuttals by Cunningham. Obviously, with the deposition in hand, they can protect themselves from any surprise answers with the threat of impeachment. But, with trial literally days away, that deposition is a luxury that I will not permit. I am given no explanation why the videotape could not have been done in sufficient time to inquire about it during Cunningham's initial deposition. In the absence of such a showing, I would consider it an abuse of discretion to permit a second deposition now. See Hoh Co. v. Travelers Indem. Co., No. 87-CV-274, 1991 WL 229948, at *3 (D.D.C. Oct. 25, 1991).

E. <u>Defendant, Marshall Bruce Mathers, III and Shady Touring, LLC's Motion to Limine and Incorporated Memorandum of Law to Exclude Evidence and Preclude Plaintiff From Referring to, Mentioning or Admitting Any Evidence of Alleged But Unsubstantiated Crowd Disturbances at the 'Gig on the Green'</u>

Plaintiff indicates that nine months before the concert at which Cunningham was injured, defendant Mathers, whose stage name is Eminem, performed at a show in Scotland, called the

"Gig on the Green." <u>Plaintiff's Opposition to Defendants' Motions in Limine to Exclude Evidence and Preclude Plaintiff From Referring to, Mentioning or Admitting Any Evidence of Crowd Disturbances at the 'Gig on the Green'</u> ("Plains. Opp. re. 'Gig on the Green'") at 3. Plaintiff claims that the crowd moved during the performance and the movement caused injuries to some of the people in attendance. <u>Id.</u>  As the name of the motion indicates, defendants wish to preclude any reference to this occurrence whatsoever in the trial of this case.

First, as to the presentation of direct evidence by plaintiff, the hearsay problems in proving what happened at the 'Gig on the Green' appear insurmountable if, as seems to be the case, plaintiff will rely on newspaper reports and blog entries concerning the 'Gig on the Green.'

Second, plaintiff insists that its expert, Jake Pauls, may rely, for example, on newspaper articles about what has occurred at a concert in order to evaluate "concert crowd management needs." Plains. Opp. re. 'Gig on the Green' at 6.  Although plaintiff indicates that it has no intention of introducing the newspapers and blogs into evidence but that Pauls may rely on these materials in support of his opinion. Id. at 5.  Rule 703 of the Federal Rules of Evidence certainly permits such reliance but it precludes the proponent of the expert's report from disclosing the data to the jury unless the "court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

The question of the admissibility of the reports concerning the 'Gig on the Green' is clouded, however, by defendants' insistence that Pauls, in his report and deposition, never once indicated that he was relying on what occurred at the 'Gig on Green' as a premise for any opinion he intended to give at the trial.  The whole purpose of Rule 26(a)(2)(B), which requires a party to provide a "complete statement of all opinions to be expressed and the basis and reasons therefor;

9

the data or other information considered by the witness in forming the opinions" is to provide that party's opponent with that complete statement during discovery so that there are no surprises at trial. Fed. R. Civ. P. 26(a)(2)(B).  To permit plaintiff to have Pauls testify as to an opinion he never indicated he had in his report and to use him to get before the jury the data upon which he relied in arriving at the newly stated opinion is to violate that rule in the most obvious way.

Although I would not permit any reference to the 'Gig on the Green' in plaintiff's direct case, I might permit a reference to it during cross-examination.  Given the dynamic nature of cross-examination, predicting how it will occur may be foolish.  Nevertheless, in the interest of time and completeness, I must say that it appears to me that the information that plaintiff has about the 'Gig on the Green' might well warrant inquiry on cross-examination.  It is settled that evidence as to prior, similar occurrences may be admissible to prove knowledge of a potentially dangerous situation. Edwards v. Consol. Rail Corp., 567 F. Supp. 1087, 1105-07 (D.D.C. 1983).  Evidence as to those prior occurrences may not fall within the hearsay ban if it is offered not to show that the accidents occurred but that the witness had knowledge of their occurrence. Fed. R. Evid. 801(c).  It would therefore be permissible to ask defendants whether they were aware that at earlier Eminem concerts the crowd moved towards the stage and when it did, people in that crowd were hurt.  If defendants admit that they were so aware, there the matter ends.  If, on the other hand, they deny being so aware, cross-examining them as to their knowledge of what happened at the 'Gig on the Green' is permissible.

F.   Motion in Limine to Exclude References to, or Evidence of, Barricade Configurations Used After the 2002 HFStival ("Defs. Mot. re. Barricades")

At the concert at issue in this case, held in 2002, a metal barricade ran across the front of

the stage. Defs. Mot. re. Barricades at 1. At the 2003 and 2004 HFStival, a different configuration was used. Id. Defendants, Infinity Broadcasting Corporation and SFX Entertainment, Inc. (d/b/a Clear Channel Entertainment), fearing that plaintiff will contrast the 2003 and 2004 configurations with the 2002 configuration, seek to bar any reference to the differences on the grounds that the change is a remedial measure whose admissibility is barred by Rule 407 of the Federal Rules of Evidence. That rule bars evidence of measures taken after the event that would have made the injury less likely to occur when offered solely to prove negligence. Fed. R. Evid. 407.

      The scope of the rule is "quite narrow." 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, §5285 at 120 (1980). "Thus, Rule 407 bars the use of safety measures only when offered to show a belief by the actor that he was guilty of a breach of a duty of care . . ." Id. at 121. If the evidence is relevant for some other purpose, it may be admitted but these permissible uses are not within the rule, rather than being the exceptions to it.

      As plaintiff points out, there is authority that rebutting a defense of assumption of risk or contributory negligence is a permissible use of evidence that the defendant took remedial measures after an accident. Pitasi v Stratton Corp., 968 F.2d 1558, 1560-61 (2d Cir. 1992); Rimkus v. Northwest Colorado Ski Corp., 706 F.2d 1060, 1065 (10th Cir. 1983). Cf. Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 407.06[2] at 407-28 ("Rule 407 does not require the exclusion of evidence of remedial measures after a defendant has attempted to use proof of conditions at the time of litigation to prove the non-existence of a dangerous condition"). Under such circumstances, it is deemed fundamentally unfair for a defendant to insist that the danger was so obvious that plaintiff had to know of it and understand

11

its full scope and magnitude and then deny plaintiff the right to show that, after the accident, the defendant took measures that gave others the warning that the defendant claimed was completely unnecessary.  In such a situation, the evidence is not being used to prove negligence but to rebut a defense.  Thus, because these defendants do not seek to bar the evidence on any grounds other than the prohibition of Rule 407, plaintiff's convincing Judge Roberts that the evidence is admissible for some other purpose, such as to rebut the defense of assumption of risk, the motion in limine advanced solely on the basis of Rule 407 must be denied at this point.

G.  <u>Motion in Limine to Exclude Expert Testimony of Jake Pauls by Defendants SFX Entertainment, Inc. d/b/a Clear Channel Communications, Inc. and Infinity Broadcasting Corporation</u> ("Defs. Mot. re. Pauls")

Jake Pauls is a ergonomist, i.e. an expert in the study of people's efficiency in their working environment.[3]

He has submitted a report in this case in which he concludes that:

1. Certain handwritten signs posted outside the portals leading to the field were inadequate.
2. The warning on the back of the ticket stub, quoted above, was inadequate to put patrons on notice of the dangers of going on the field.
3. The crowd allowed onto the field was permitted to grow so that there was a significant danger that compressive asphyxia could result.

Defs. Mot. re. Pauls at 4.

As to the handwritten signs, Pauls indicates that they fell below the national standard for warning signs approved by the American National Standards Institute (ANSI).  While there is no ANSI standard specifically tailored for the back of ticket stubs, Paul concluded that a related ANSI standard requires that a warning like the one on the ticket stub should communicate

---

[3] <u>The Oxford Compact English Dictionary</u> 370 (Catherine Soanes ed., Oxford University Press 2d ed. 2003).

information to an observer "on the type of hazard, the consequences of not avoiding the hazard and how to avoid the hazard." Id., Exhibit D at 2.

Finally, Pauls relies on another ANSI standard, the Life Safety Code, published by the National Fire Protection Association, for the articulation of a standard of the appropriate density that concert organizers should permit when crowds move towards the stage and stand around it. Id., at 3-6.

SFX Entertainment and Infinity Broadcasting first attack Pauls' testimony as inadmissible because: (1) Pauls admitted that he is not an expert on warnings; (2) the ANSI standards are voluntary and a failure to conform one's behavior to them cannot be the premise of a scientific conclusion that the organizers of the concert did not comply with the applicable standard of care; and (3) his conclusion that the injuries Cunningham sustained would have been prevented by more adequate signage and warnings is not based on any scientific knowledge and cannot serve as a predicate for the causation plaintiff must establish. Id. at 6-10.

They make a similar attack on his testimony as to the significance of the crowd entering the field and crowding the stage. They insist that he lacks adequate qualifications to give any opinion as to "general admission crowd management at a stadium music festival." Id. at 16. Again they insist that the standard in the Life Safety Code is voluntary and that Pauls admitted that he did not know whether the District of Columbia has adopted it and that stadiums in almost every state have general admission shows that do not comply with the Life Safety Code standard. Id. at 17-18. They also point out that the arithmetic Pauls used to compute the number of people crowding the stage does not allow for the possibility that the Fire Marshal could have approved any occupancy he deemed appropriate and, in any event, that Pauls cannot establish that, even if

occupancy on the field had been limited as Pauls insists it should have been, that Cunningham would not have been injured as he was. Id. at 18.

Rule 702 of the Federal Rules of Evidence permits an expert to offer an opinion if: (1) the testimony is based upon sufficient facts and data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.  While Rule 702 was amended in 2000 in response to Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993), the draftsmen made it clear that "no attempt has been made to 'codify' these specific factors [i.e., the factors identified in Daubert bearing on the admissibility of expert testimony].  *Daubert* itself emphasized that the factors were neither exclusive nor dispositive.  Other cases have recognized that not all of the specific *Daubert* factors can apply to every type of expert testimony." Fed. R. Evid. 702 advisory committee's note.  Thus, courts have held that a wooden reliance on the Daubert factors can be erroneous. Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19, 25 (2nd Cir. 1994).  See Kumho Tire Co. Ltd., v. Carmichael, 526 U.S. 137, 158 (1999) (standards used to assess reliability of expert evidence must be flexible; Daubert does not apply *in haec verba* to every case).  Indeed, the advisory committee notes identify five factors, not mentioned in Daubert, that courts have found "relevant in determining whether they have developed their opinions expressly for the purposes of testifying." Fed. R. Evid. 702 advisory committee's note.  Thus, the admissibility of Pauls' opinion is to be judged by the factors identified in Rule 702 itself.

As to the warnings on the signs and on the back of the ticket, I believe that the requirements of the rule are met.  Pauls did nothing more than compare what was on the sign with the ANSI standards and his doing so surely rendered his testimony admissible as an opinion

based on: (1) sufficient facts or data; (2) the product of reliable principles and methods; and (3) the reliable application of those principles and methods to the facts of the case.

This is not to say that defendants may not argue that the ANSI standards do not define the applicable standard of care or that any deviation from those is necessarily the proximate cause of an individual's injuries if, for example, the individual does not see the sign, does not read the back of the ticket, or proceeds to the field in spite of them. But, those arguments go ultimately to liability and not to the admissibility of Pauls' testimony.

I reach a different conclusion as to Pauls' opinion as to the number of people he estimates entered the field. In my view, his estimate raises a significant issue as to whether his opinion is based on sufficient facts or data and whether he has applied his estimates in a reliable manner. I therefore believe that a hearing should be held prior to trial to explore that issue. Judge Roberts has advised me that he will hold the hearing at the pre-trial conference and that the plaintiff should have Pauls available to testify at that time.

H.  <u>Defendants SFX Entertainment, Inc. d/b/a Clear Channel Communications, Inc. and Infinity Broadcasting Corporation's Memorandum In Support of Their Motion in Limine to Exclude Testimony of Kathleen Sampeck</u> ("Defs. Mot. re. Sampeck")

As noted above, one element of the calculation of the damages Cunningham seeks is the difference between what he would have earned had he secured a graduate degree and what he will earn with a bachelor's degree.

Kathleen Sampeck is a Vocational Rehabilitation Consultant and Life Care Planner who has issued a report in which she states: "It is my opinion that Justin's [Cunningham's] cognitive deficits have resulted in a substantial reduction in occupational choice, and a loss of earning capacity ranging from $12,969 to $15,680 annually. His worklife expectancy is 39.2 years."

Plaintiff's Opposition to Defendants Motion in Limine Seeking to Exclude the Testimony of Plaintiffs' [sic] Vocational Rehabilitation Specialist Kathleen Sampeck, Exhibit 3 at 10.  The report indicates that the differential between what those with a bachelor's degree earn and those with a graduate degree is based on U.S. Census Bureau, Statistical Abstract of the United States: 2003. Id.  The difference between the $12,969 figure and the $15, 680 figure that Sampeck uses as a range is the difference between what all persons with those degrees earn on average and what all men with those degree earn. Id.

      Sampeck bases her conclusion that Cunningham now has cognitive deficits upon the evaluations and test performed by medical professionals. Id. at 4-7.  In her deposition she explains how she concluded that, but for his injuries, Cunningham would have secured a graduate degree. Id., Exhibit 2 at 23.  She begins with the premise that, before his injuries, Cunningham's IQ level, based on his SAT scores, was high average to above average. Id. at 24.  She also noted that he had completed nine honors and advanced placement courses in high school and had received academic achievement awards. Id.  Thus, when he began at Maryland and in his first two years there, he was enrolled in the School of Business and was taking business courses. Id. at 19.  Based on his SAT scores and his resulting IQ score, Sampeck opined that it was likely that, but for his injuries, he would have gone on to graduate school. Id. at 25.  However, he has switched his major to a less demanding one and has needed accommodations and assistance to continue at school because of the cognitive deficits the medical professionals reported. Id. at 26.  Testing also shows a diminution in his IQ. Id.  On the basis of that information and her experience in vocational counseling and vocational rehabilitation, Sampeck concluded that it was now most unlikely that Cunningham would attend graduate school. Id. at

25. Sampeck testified as to that experience as follows when she was asked what, in her experience, qualified her to say whether or not someone has the capacity to get a graduate degree:

> I've evaluated thousands of people and counseled thousands of people in the setting in which someone is doing career planning or coordinating plans for training for people. I have done assessments of many individuals with college educations or with goals of going to graduate school and have had to look at what their academic records are, what their test scores are, data similar to what we have described in here, evaluate what their problems are going to school, helping them select suitable educational plans, suitable vocational goals.

Id. at 27-28.

I believe that a hearing should also be held as to the admissibility of her testimony that Cunningham would have gone to graduate school had he not been injured. Compare Joy v. Bell Helicopter Textron Inc., 999 F.2d 549, 567-70 (D.C. Cir. 1993) (estimate of future earning capacity rejected as speculative) with Boyar v. Korean Air Lines Co., Ltd., 954 F. Supp. 4, 8 (D.D.C. 1996) (inference that deceased would have expanded his medical practice permissibly based on the evidence).  See Elcock v. Kmart Corp., 233 F.3d 734, 744-50 (3d Cir. 2000) (error not to hold hearing to assess reliability of testimony of vocational rehabilitation expert).  Again, Judge Roberts has advised me that he will hold that hearing at the pre-trial conference and that plaintiff should have Sampeck available to testify.

An Order accompanies this Memorandum Opinion.


_____
Dated:                                                              JOHN M. FACCIOLA
                                                                              UNITED STATES MAGISTRATE JUDGE