UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ───────────────────────────── ) | |
| JUSTIN CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 03-839(RWR)(JMF) |
| ) | |
| DISTRICT OF COLUMBIA SPORTS ) | |
| AND ENTERTAINMENT ) | |
| COMMISSION, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ───────────────────────────── ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Justin Cunningham brought this negligence action seeking compensatory and punitive damages against defendants for injuries he received while attending a concert known as the HFStival.  The defendants have filed various motions for summary judgment arguing that they owed no duty to plaintiff, that plaintiff has offered no evidence to demonstrate that any negligence by defendants proximately caused plaintiff's injuries, that plaintiff assumed the risk of his injuries, and that plaintiff has put forth no evidence of malice in order to warrant punitive damages.  Because each defendant owed a duty to plaintiff and genuine issues of material fact remain with regard to plaintiff's claims for compensatory and punitive damages, defendants' motions for summary judgment will be denied.

- 2 -

BACKGROUND

On May 25, 2002, Justin Cunningham was seriously injured while attending an annual area concert known as the HFStival. The HFStival is a popular annual concert sponsored by local radio station WHFS.  The 2002 HFStival was sponsored and partially promoted by Infinity Broadcasting Corporation ("Infinity"), owner and operator of WHFS.  SFX Entertainment, Inc., doing business as Clear Channel Communications ("Clear Channel"), produced the event.  One of the headlining acts at the 2002 HFStival was recording artist Marshall Bruce Mathers, III, also known as Eminem.  Shady Touring, LLC is the business entity through which Mathers was booked for the HFStival.  Clear Channel secured RFK Stadium in Washington, D.C. as the concert venue from the District of Columbia Sports and Entertainment Commission ("D.C. SEC").  Contemporary Services Corporation ("CSC") was contracted to provide crowd management and guest services at the concert.

The HFStival was general admission with no assigned seating. (Infinity Broad. and Clear Channel Comm. Mot. Summ. J. ("Clear Channel Mot. Summ. J.") at 6; Cunningham Opp'n to Infinity Broad. and Clear Channel Comm. Mot. Summ. J. ("Cunningham Opp'n to Clear Channel") at 3.)  In addition, fans were allowed to view the concert from the field level in a festival seating area, where no seats were available and audience members could stand directly in

- 3 -

front of the stage.  (Id.)  A straight-line barricade separated

the stage from the fans on the field.  (Cunningham Opp'n to Clear

Channel at 4.)  Large screen monitors that displayed what was

happening on stage and, at least occasionally, shots of the

crowd, were also provided on each side of the stage.  (Clear

Channel Mot. Summ. J. at 7.)  In all, about 43,500 people

attended the concert.  (Cunningham Opp'n to Clear Channel at 4.)

CSC deployed security staff throughout the stadium: 70 to protect

headliner Mathers on stage, 45 between the barricade and the

stage, 6 behind the main stage, 10 at the fire lanes and ramps,

10 at the mezzanine level, and 4 at the upper level behind the

stage area.  (Clear Channel Mot. Summ. J. at 6.)  Hand-written

signs that warned of the risk of injury of going onto the field

were posted at the entrance of the field's general seating level.

(Id. at 7, Ex. S, Warning Signs.)  The concert ticket also

contained a disclaimer that the "holder assumes all risk and

danger incidental to the attraction."  (Id. at 17, Ex. T, Ticket

Stub.)  In 2001, a Mathers performance was halted in Scotland due

to a crowd crush incident where 45 fans were injured, though not

seriously.  (Cunningham Opp'n to Clear Channel, Ex. 41, VH1.com

Article.)

Cunningham began his outing to the HFStival with a pre-

concert tailgate party in the RFK parking lot.  (Clear Channel

- 4 -

Mot. Summ. J. at 5.)  At the tailgate party and later while inside the stadium, Cunningham drank beer.  (Id. at 5-6.)  At the time, Cunningham was only twenty-years old and used a fake ID to obtain alcohol while in the stadium.  (Id. at 6.)  This, however, was not Cunningham's first experience with alcohol.  He was required to perform eight hours of community service for a possession of alcohol citation when he was 17.  (Cunningham Dep. at 127-28, Feb. 10, 2004.)

In anticipation of Mathers's performance, Cunningham and a friend pushed their way through the crowd to the front near the stage.  (Clear Channel Mot. Summ. J. at 7.)  At the time, it was evident that the crowd was "pretty packed" and "[e]veryone was very close together."  (Killen Dep. at 57, Feb. 11, 2004.)  There is evidence that crowd surfing, namely, lifting people on top of the crowd and passing them around, was taking place and that, at least earlier in the day, fans formed "mosh" pits.  (Clear Channel Mot. Summ. J. at 7; Cunningham Opp'n to Clear Channel at 17 n.2.)  Moshing involved people pushing, running, throwing, and slamming into each other.  (Clear Channel Mot. Summ. J. at 14.) Cunningham had experienced these aspects of crowd behavior at concerts he previously attended.  (Id. at 8.)  Further, Cunningham had actually witnessed his friend get "trampled" while attending the 2000 HFStival.  (Id. at 9-10.)

- 5 -

Once Mathers took the stage, the crowd density continued to increase as fans pushed forward for a closer view. (Cunningham Opp'n to Clear Channel at 7.) As Mathers performed, Officer Paul Hoffman of the Metropolitan Police Department noticed a pile of thirty to fifty bodies in the festival seating area. (Hoffman Dep. at 10-13, May 12, 2004.) CSC employee Chris Garner testified that he saw an individual lose his footing and fall in the crowd with several people falling on top of him all due to the shifting of the crowd. (Garner Dep. at 19, 22, May 12, 2004.) Officer Hoffman further testified that he saw a body being brought out from this pile of bodies in the festival seating area. (Hoffman Dep. at 11-13.) It is undisputed that plaintiff was the person pulled out of the crowd. Over five minutes elapsed from the time a problem was first discovered and the music was cut. (Cunningham Opp'n to Clear Channel, Ex. 38, Cohen Timeline.) At that point, Mathers instructed the crowd to calm down and back up. (Id.)

After being pulled from the crowd, Cunningham had to be revived by emergency personnel. (Cunningham Opp'n to Clear Channel at 24.) He remained in a coma for six days and retains no memory of the incident that brought about his injuries. (Cunningham Opp'n to Clear Channel at 9.) There is no eyewitness testimony as to exactly how Cunningham came to be injured.

(Clear Channel Mot. Summ. J. at 10.)   Dr. Andrew McCarthy, Cunningham's treating physician, testified that plaintiff suffered from rhabdomyolysis, a condition associated with crush injuries.   (Cunningham Opp'n to Clear Channel at 8.)   Cunningham claims that he continues to suffer from his injuries - - specifically an impaired short-term memory, decreased mathematical ability, weakness and tremors on the right side of his body, a tendency to stutter, and difficulty writing.   (Cunningham Opp'n to Clear Channel at 9.)

Cunningham maintains that he was crushed in the pile of thirty to fifty people, causing his heart and breathing to stop, as a result of a crowd surge caused by defendants' collective negligence.   (Cunningham Opp'n to Clear Channel at 23-28.)   Cunningham specifically points to the lack of preparation, emergency planning and crowd management as the cause of the crowd surge.   Defendants placed no restrictions on the number of fans allowed on the field and installed only a straight-line barricade directly between the fans and the stage.   (Id. at 30-31.)   Cunningham has offered evidence that the industry realized the propensity of overly large crowds to cause injury to concertgoers and, in response, had begun using "T" and "H" shaped barrier configurations which reduce waving and limit congestion from building in a single area.   (Id. at 4-5.)   Cunningham has also

offered evidence that the emergency planning meeting for the event was held only an hour before the event, lasted less than one hour and no personnel from CSC or the performing artists were in attendance despite the crowd crush incident at a previous Mathers concert.  (Id. at 5, 7.)  In addition, designated emergency personnel lacked radios with which to communicate with one another in the event that something went wrong.  (Id. at 6.)

All defendants have filed motions for summary judgment. Infinity and Clear Channel ("Clear Channel defendants") jointly filed their motion arguing that plaintiff assumed the risk of his injuries, that plaintiff had not established proximate cause, and that no grounds existed to sustain plaintiff's request for punitive damages.  In their reply, the Clear Channel defendants added the argument that plaintiff had not established that they owed any duty to plaintiff.  D.C. SEC wholly adopted the motion submitted by the Clear Channel defendants.  Mathers and Shady Touring (the "Mathers defendants") also adopted the Clear Channel defendants motion, and emphasized that they owed no duty to plaintiff and no actions taken by them proximately caused plaintiffs injuries.[1]  CSC filed a motion for summary judgment

_____

[1] The Mathers defendants' motion perfunctorily asserted that plaintiff's claims are barred by contributory negligence as a matter of law.  Their supporting memorandum did not discuss this argument.  Over two months after plaintiff opposed their motion and just eleven days before the scheduled pre-trial conference, the Mathers defendants, without seeking leave to file out of

- 8 -

adopting the Clear Channel defendants' motion, but argued
separately that it owed no duty to plaintiff.  Plaintiff opposed
all defendants' motions.

### DISCUSSION

"Summary judgment is appropriate when evidence on file shows
that there is no genuine issue as to any material fact and
the moving party is entitled to a judgment as a matter of
law . . . .  Not all alleged factual disputes represent genuine
issues of material fact which may only be resolved by a jury.
Material facts are those that might affect the outcome of the
suit under governing law, and a genuine dispute about material
facts exists if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."  America's Community
Bankers v. FDIC, 200 F.3d 822, 831 (D.C. Cir. 2000) (quotations
and citations omitted).

In deciding whether there is a genuine issue of material
fact, the court must assume the truth of all statements proffered
by the non-movant except for conclusory allegations lacking any
factual basis in the record.  Summary judgment may be granted
even if the movant has proffered no evidence, so long as the
non-movant "fails to make a showing sufficient to establish the

time, filed a reply fully articulating for the first time an
argument concerning contributory negligence.  Because the reply
was untimely, it will be stricken.

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Dist. Intown Props. L.P. v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "Although the burden on the nonmoving party is not great, it is still required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." Palestine Info. Office v. Shultz, 853 F.2d 932, 944 (D.C. Cir. 1988) (internal quotation and citation omitted).

I.   NEGLIGENCE

"The elements of a common law action for negligence are (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3) damage to the plaintiff, proximately caused by the breach of duty." Powell v. District of Columbia, 634 A.2d 403, 406 (D.C. 1993).

A.   Duty

"[W]hether a duty is owed is a question of law to be determined by the court." Hoehn v. United States, 217 F. Supp. 2d 39, 45 (D.D.C. 2002) (citing Settles v. Redstone Dev. Corp., 797 A.2d 692, 695 (D.C. 2002)).  A "duty of care will arise with respect to a condition that poses an 'unreasonably great risk of harm.'" Lipnick v. United States, 717 F. Supp. 902, 904 (D.D.C. 1989) (quoting Westinghouse Electric Corp. V. Nutt, 407 A.2d 606,

609 (D.C. 1979)).  The existence of a duty of care depends on the

facts and circumstances of each case.  The Restatement of Torts §

303 defines an act as "negligent if the actor intends it to

affect, or realizes or should realize that it is likely to

affect, the conduct of another, a third person, or an animal in

such a manner as to create unreasonable risk of harm to the

other."  Restatement (Second) of Torts § 303 (1965).

Section 303 is merely an application of the established duty

which arises from creating an unreasonable risk of harm.  See

Clark v. Library of Congress, 750 F.2d 89, 98 (D.C. Cir. 1984);

cf. Wilson v. Good Humor Corp., 757 F.2d 1293, 1305 (D.C. Cir.

1985) (relying on Restatement (Second) of Torts § 413 to outline

the contours of a tort, despite the lack of a District of

Columbia case expressly adopting the section).  Although

foreseeability is an element of duty, it "does not define duty –

it merely determines the scope of the duty once it is determined

to exist."  District of Columbia v. Beretta, No. 0428-00, 2002 WL

318711717, at *18 (D.C. Super., Dec. 16, 2002) (quoting Hamilton

v. Beretta, 96 N.Y.2d 222, 232, 750 N.E.2d 1055, 1060 (N.Y.

2001)).

"A possessor of land who holds it open to the public for

entry for his business purposes is subject to liability to

members of the public while they are upon the land for such a

- 11 -

purpose, for physical harm caused by the accidental, negligent,

or intentionally harmful acts of third persons . . . ."

Restatement (Second) of Torts § 344; see Becker v. Colonial

Parking, Inc., 409 F.2d 1130, 1133-34 (D.C. Cir. 1969) (applying

Restatement (Second) of Torts § 344 and holding that a parking

lot operator in the District of Columbia owed a duty to its

business invitees).  A duty of care may also arise when a

defendant assumes a contractual duty that "place[s] [the

defendant] in the position of assuming a duty to [a plaintiff] in

tort."  Caldwell v. Bechtel, 631 F.2d 989, 997 (D.C. Cir. 1980).

The duty arises from a "special relationship" between the

plaintiff and defendant created by the nature of the contractual

relationship.  Id. at 1002.

    B.   Proximate cause

"To establish proximate cause, the plaintiff must present

evidence from which a reasonable juror could find that there was

a direct and substantial causal relationship between the

defendant's breach of the standard of care and the plaintiff's

injuries and that the injuries were foreseeable. . . .  Proximate

cause is generally a factual issue to be resolved by the jury,

however, it becomes a question of law when the evidence adduced

at trial will not support a rational finding of proximate cause.

Furthermore, a plaintiff may meet his burden by offering either

- 12 -

direct or circumstantial evidence." District of Columbia v.
Zukerberg, 880 A.2d 276, 281 (D.C. 1981) (internal citations and
quotations marks omitted).

    C.   Assumption of risk

    In the District of Columbia, a plaintiff who "is aware of
the risk created by the defendant's negligence [and] deliberately
chooses to encounter that risk" assumes the risk and releases the
defendant from any duty otherwise owed the plaintiff. Morrison
v. MacNamara, 407 A.2d 555, 566 (D.C. 1979). The plaintiff must
"subjectively know[] of the existence of the risk and
appreciate[] its unreasonable character." Krombein, 317 F. Supp.
2d 14, 20 (D.D.C. 2004) (quoting Jarrett v. Woodward Bros., Inc.,
751 A.2d 972, 986 (D.C. 2000) (internal quotation marks omitted).
This "implies more than knowledge of the defect that constitutes
the danger. It also includes an appreciation and an
understanding of the dangers that lurk in the defect and result
in the injury . . . ." Willis v. Stewart, 190 A.2d 814, 817-18
(D.C. 1963). The doctrine of assumption of risk is a "heavily-
fact based inquiry" that is usually for the jury. Krombein, 317
F. Supp. 2d at 20; Willis, 190 A.2d at 818. A court should grant
summary judgment only if no real dispute exists as to the
plaintiff's awareness and full comprehension and appreciation of
the danger. Krombein, 317 F. Supp. 2d at 20; Morrison, 566 A.2d

- 13 -

at 566-67.  "[E]vidence merely tending to show that the plaintiff
was aware of the risk is insufficient . . . ."  Morrison, 407
A.2d at 567.  The burden of proving assumption of risk lies with
the defendant.  Krombein, 317 F. Supp. 2d at 21.  When
established by the defense, assumption of risk serves as a
complete bar to any recovery by the plaintiff.  Id. at 20.

    D.   Punitive damages

    To receive punitive damages for a negligence claim, "the
plaintiff must prove, by a preponderance of the evidence, that
the defendant committed a tortious act, and by clear and
convincing evidence that the act was accompanied by conduct and a
state of mind evincing malice or its equivalent."  Croley v.
Republican Nat'l Comm., 759 A.2d 682, 695 (D.C. 2000).  "The
requisite state of mind need not (and usually cannot) be proved
by direct evidence, but may be inferred from all the facts and
circumstances of the case."  Robinson v. Sarisky, 535 A.2d 901,
906 (D.C. 1988).  However, "[p]unitive damages are not favored by
the law.  They are awarded to punish and deter outrageous
conduct, and the question is whether a defendant's conduct
contains elements of intentional wrongdoing or conscious
disregard for plaintiff's rights."  Knippen v. Ford Motor Co.,
546 F.2d 993, 1002 (D.C. Cir. 1976) (internal citations and

- 14 -

quotation marks omitted).  Even "gross negligence will not support punitive damages."  Id. at 1003.

II.  DUTY OWED TO CUNNINGHAM

A.  The Clear Channel defendants

The Clear Channel defendants argue that they owed no duty to plaintiff and therefore, summary judgment is warranted.[2] Specifically, defendants claim that the stadium license agreement that allowed them to use and occupy RFK Stadium for the 2002 HFStival did not delegate to them any responsibility for crowd management.  This claim misreads the contract and the law.

An entity that secures property on which it hosts a public concert is subject to liability to concertgoers harmed there by third persons.  See Restatement (Second) of Torts § 344; Becker v. Colonial Parking, Inc., 409 F.2d 1130, 1133-34 (D.C. Cir. 1969); accord Brewer v. Monqui, Inc., No. 53939-6-I, 2005 WL 1725709, *1 (Wash. Ct. App. 2005) (holding a concert promoter that had a written license from the city to occupy and use an arena owed a duty as a possessor of the land to a concert attendee).  Here, it is clear that the Clear Channel defendants

---

[2] The D.C. SEC adopted the Clear Channel defendants motion for summary judgment.  The Clear Channel defendants raised the duty argument in their reply only, which D.C. SEC has not adopted.  Therefore, the duty argument will not be considered with respect to D.C. SEC.

- 15 -

were possessors of RFK Stadium on May 25, 2002.  The stadium license agreement explicitly gives them the right to "use and occupy" the stadium field areas for production, staging and seating, in addition to other areas of the stadium.  (Clear Channel Reply, Ex. U, Stadium License Agreement at 1-2.)  It is equally clear that the concert attendees, including plaintiff, were business invitees of the defendants.

The Clear Channel defendants' argument that the Stadium License agreement does not give rise to a duty because it did not delegate to them any responsibility for crowd management simply misses the legal mark.  Even if that argument were correct, the argument overstates the language of the contract.  The stadium license agreement states only that "the Commission shall provide . . . crowd control staff and Metropolitan Police Department officers [and] emergency medical services."  (Id. at 2.)  This provision delegates only the staffing of crowd management personnel, not all crowd management responsibilities, such as planning and preparation.

B.   The Mathers defendants

The Mathers defendants argue that plaintiff has failed to allege any affirmative actions taken by them that created an unreasonable risk of harm.  They contend that Mathers did nothing more than take the stage to perform.  (Mathers Mot. Summ. J. at

- 16 -

7.)  They also note that defendant Shady Touring was not involved
with crowd control or management.  (Id. at 8.)

Cunningham has offered evidence that the Mathers defendants
failed to stop the performance until more than five minutes after
the incident in question was apparent.  (Cunningham Opp'n to
Mathers Mot. Summ. J. at 10.)  The unreasonable risk of harm
created by the Mathers defendants' failure to stop once the
potential danger was apparent is sufficient to establish a duty
between a performer or touring company and a concertgoer.  See
Thielmier v. Louisiana Riverboat Gaming, 732 So.2d 620 (La. 1999)
(holding performer owed a duty of reasonable care to an audience
member he called on stage who fell on her way back off the
stage).

Cunningham has also offered evidence that a crowd crush
incident took place at a prior Mathers performance.  (Cunningham
Opp'n to Mathers Mot. Summ. J. at 7.)  Cunningham argues that the
Mathers defendants' experience with this type of incident made
them familiar with the type of crowd their performances attract
and the crowd's propensity to push towards the stage.  (Id. at 7,
10-11.)  This, they argue, made the events that took place on May
25, 2002 foreseeable.  Evidence of this prior incident is
sufficient to create a genuine issue of material fact as to the
foreseeability of the events that took place.  See Weirum v. RKO

- 17 -

General, Inc., 15 Cal. 3d 40, 47 (1975) (finding it was
foreseeable that "defendant's youthful listeners . . . would race
to arrive first at the next site and in their haste would
disregard the demands of highway safety.")  Although duty is a
question of law, "foreseeability is a question of fact for a
jury." Weirum, 15 Cal. 3d at 46 (citing Wright v. Arcade School
Dist., 230 Cal. App. 2d 272, 277 (1964)).

    The contract between the Mathers defendants and WHFS
required WHFS to "provide and pay for adequate security for
protection of all persons and property . . . including . . .
patrons."  (Cunningham Opp'n to Mathers Mot. Summ. J. at 13.)  If
that, or any other provision in the contract, was breached, the
Mathers defendants had the right to "refuse to perform th[e]
contract." Id.  Because the Mathers defendants had the ability
to withdraw from the show if WHFS failed to provide adequate
protection for the audience, a duty in tort was created between
defendants and plaintiff. Caldwell, 631 F.2d at 996 (finding
duty where defendant had authority under the contract to "'order
a work stoppage' when necessary to carry out its duties with
respect to enforcing safety regulations.")  Like the defendant in
Caldwell, Mathers was empowered to act (by refusing to take the
stage in unsafe conditions) to ensure the safety of others (the
throngs of fans gathered to see him).

- 18 -

C.   CSC

In support of its argument that CSC owed no duty in tort to plaintiff and that summary judgment is appropriate, CSC relies primarily on Frederick v. TPG Hospitality, Inc., 56 F. Supp. 2d 76 (D.D.C. 1999).  In Frederick, the plaintiff was a guest at a hotel who brought a negligence suit against the security services company, Intersec, contracted by the hotel to provide security for the hotel and its guests.  Id. at 77-78.  The court held that although the hotel owner owes a duty to provide adequate security to protect its guests from foreseeable risks, Intersec had done nothing to assume that duty.  Id. at 79.  The court reasoned that the contract between Intersec and the hotel stated only that the Intersec would provide personnel at certain rates and that the hotel would pay all bills within ten days.  Id.  The court further stated that the contract did not require Intersec to advise the hotel on how to use or deploy any personnel provided or to give input as to what level of security was appropriate. Id.  The court emphasized that "there was nothing in writing that memorialized Intersec's or the security guards' responsibilities and duties[.]"  Id.

Though CSC believes Frederick should guide this court, the contract at issue here is not so bare bones as the one at issue in Frederick.  CSC agreed to more than simply providing personnel

at a specified rate.  CSC's contract required CSC to "exercise

the ordinary standard and care expected in the industry" and

delineated a non-exhaustive list of responsibilities delegated to

CSC: crowd control, access control, and contraband inspection.

While some of these responsibilities were to be performed as

directed by the D.C. SEC, CSC was alone responsible for

responding to crowd disturbances.  In addition, CSC was required

to "reasonably provide additional personnel in the event of an

emergency situation . . . or as needed."  Under these

circumstances, CSC assumed a duty to act reasonably so that

attendees of the concert would be protected from foreseeable

risks.  See Caldwell, 631 F.2d at 1000-02 (holding that a

contract between a consulting engineering firm and WMATA gave

rise to a duty owed by the firm to an injured worker not party to

the contract).

III. PROXIMATE CAUSE

Defendants collectively maintain that "[a]lthough Plaintiff

speculates about what caused his injury, he offers no proof, no

evidence, that Defendants' alleged negligence, namely that the

crowd was too dense, caused Plaintiff's injury."  (Clear Channel

Motion for Summ. J. at 19.)  However, this assertion simply

ignores the evidence on record.  Garner testified that when

Mathers took the stage, the crowd shifted "real heavy," waving

from left to right, and that "folks were getting pushed from the rear to the front."  (Garner Dep. at 19.)  Garner further testified that he saw an individual lose his footing and fall in the crowd due to the shifting of the crowd and that the shifting also caused several persons to fall on top of that individual. Hoffman saw plaintiff's body being brought out from a pile of bodies in the festival seating area.  Dr. McCarthy concluded that plaintiff suffered from rhabdomyolysis, a condition associated with crush injuries.

Defendants insist this is mere speculation.  It is not.  It is circumstantial evidence sufficient to create a genuine dispute of material fact as to whether the alleged negligence of the defendants was at least a substantial factor in causing plaintiff's injuries.

IV. ASSUMPTION OF RISK

Defendants argue that plaintiff knew the risks of underage drinking and entering a dense crowd at a concert and, nonetheless, voluntarily encountered them.  To carry their burden of proof, defendants point to several pieces of evidence.  First, defendants point to hand-written signs posted in the stadium and a disclaimer on the back of the ticket stub.  (Clear Channel Mot. Summ. J. at 17.)  One of the signs read:

"WARNING!!  To All Patrons[.]  It is possible you may
come into physical contact with other patrons in the

- 21 -

> field area.  If you choose to enter the field 1) you do
> so AT YOUR OWN RISK of potential injury from the
> actions of other patrons AND 2) you agree upon entering
> the field area that the event is not responsible for
> any physical injury to you that occur as a result of
> the actions of others."  (Id. at 7, Ex. S.)

However, defendants do not suggest that plaintiff observed

the signs or read the back of the ticket.  Defendants next note

that plaintiff voluntarily entered the festival seating area

where the size of the crowd was obvious when plaintiff entered

it, and in any event, was displayed on large screen monitors next

to the stage for all to see.  (Id. at 7.)  Defendants also note

that plaintiff admits to drinking before entering the HFStival

and argue that he knew of the dangers associated with that

drinking because plaintiff previously received a citation for

underage drinking and was grounded for a month.  (Id. at 13-14.)

Defendants also identify evidence that indicates plaintiff knew

that moshing had occurred at a previous HFStival and presumably

could occur at the 2002 HFStival.  (Id. at 14.)

In order to establish that plaintiff fully appreciated and

comprehended the scope of the risk, defendants point to

plaintiff's deposition testimony that he never entered a mosh pit

because he did not "want to get [his] teeth knocked out, get

[his] nose broken, stuff like that."  (Id. at 8.)  Defendants

also identify evidence that plaintiff knew of the danger of

falling in a dense crowd because plaintiff's friend had

- 22 -

previously fallen in a crowd and been trampled on at the 2000
HFStival when plaintiff was present.  (Id. at 9-10.)  Finally,
defendants point to deposition testimony of the plaintiff
describing the 2000 HFStival as proof plaintiff fully appreciated
that crowds could not be controlled.  (Id. at 16-17.)  In
describing the swaying of the crowd, plaintiff stated that
"[i]t's something that happens in the crowd that you cannot
control."  (Id. at 16.)  Plaintiff also testified that "it's not
necessarily that safe when you don't have control over your
body."  (Id. at 17.)  In light of all of this, defendants
maintain that plaintiff assumed the risk of encountering the
dense crowd fully appreciating the attendant dangers.

        Although defendants have established that plaintiff knew of
the dense crowd and appreciated some risks associated with it,
the defendants have not established, for the purposes of summary
judgment, that plaintiff subjectively appreciated the full risk
of a crowd surge or the true extent of the danger posed by that
risk.  Summary judgment is appropriate only if no real dispute
exists as to the plaintiff's awareness and full comprehension and
appreciation of the danger.  Krombein, 317 F. Supp. 2d at 20;
Morrison, 566 A.2d at 566-67.  "[E]vidence merely tending to show
that the plaintiff was aware of the risk is insufficient . . . ."
Morrison, 407 A.2d at 567.  To be sure, plaintiff's experience of

seeing his friend having been trampled on when falling in a dense crowd and plaintiff's admission that he was aware his nose could be broken in a mosh pit are evidence that he was aware of some risks attendant with entering a crowd at a concert.  However, evidence that plaintiff understood the risk of being in a mosh pit, or falling in a dense but not surging crowd, does not settle the dispute about whether plaintiff was aware of and understood the risk posed by a massive crowd surge in an already dense crowd that could nearly crush an individual and cause his heart and breathing to cease.  In order to have summary judgment granted, it is simply not sufficient to show that plaintiff was aware of only some of the attendant risks.  See Krombein, 317 F. Supp. 2d at 22 (refusing to grant summary judgment based on assumption of risk in a slip and fall case where evidence showed plaintiff knew of risk associated with a wet floor but not a waxed floor).  In addition, defendants have not established that there is no dispute over what plaintiff meant by the facially ambiguous statement that "you cannot control" the crowd.  A reasonable jury could interpret plaintiff's statement to be an admission that plaintiff understood that the crowd simply could not be controlled by anyone, including defendants.  Or, it could be an admission only that a concert attendee in the crowd is not capable of controlling the crowd.  Under this second

- 24 -

interpretation, the statement provides no evidence that the
plaintiff subjectively assumed the risk that the defendants could
not control the crowd.  Because a reasonable jury could come to
either conclusion, summary judgment is not warranted.

V.   PUNITIVE DAMAGES

Defendants assert that plaintiff has presented no evidence
that defendants acted with malice.  (Clear Channel Mot. for Summ.
J. at 20-22.)  Plaintiff maintains that the "short shrift given
by all the defendants to crowd management planning and safety,
with the foreknowledge that injuries in large crowds do occur,
constitutes outrageous conduct" and that malice may be inferred
from all the facts and circumstances of the case.  (Cunningham
Opp'n at 34.)

"Summary judgment on the issue [of whether a defendant acted
with malice] is rarely appropriate."  Nickens v. Labor Agency of
Metro. Washington, 600 A.2d 813, 820 (D.C. 1991).  Here, it is
possible that an inference that the defendants' conduct was
outrageous and evinced an evil motive reasonably could be drawn
from evidence of defendants' lack of preparation, emergency
planning and crowd management in light of information available
to the defendants and the industry.

- 25 -

<u>CONCLUSION AND ORDER</u>

Because each defendant owed a duty to plaintiff and there are genuine issues of material fact that remain in regard to whether each of the defendants' alleged negligence proximately caused plaintiffs injuries, whether defendants acted with malice, and whether plaintiff assumed the risk of those injuries, defendants' motions for summary judgment will be denied. Accordingly, it is hereby

ORDERED that the Clear Channel defendants' motion [70] for summary judgment, D.C. SEC's motion [73] for summary judgment, the Mathers defendants' motion [74] for summary judgment and CSC's motion [75] for summary judgment be, and hereby are, DENIED.  It is further

ORDERED that the Mathers defendants' reply [106] be, and hereby is, STRICKEN.  It is further

ORDERED that Cunningham's motion [80] for a hearing on the motions for summary judgment be, and hereby is, DENIED.

SIGNED this 30th day of November, 2005.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge